**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **RASOOL MCCRIMMON,** | **Civil Action No. 18-8166 (SDW)** |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **STEVEN JOHNSON, et al.,** | |
| **Respondents.** | |

**WIGENTON,** District Judge:

Presently before the Court is the amended petition for a writ of habeas corpus of Rasool McCrimmon ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court convictions.  (Document 5 attached to ECF No. 14).  Following an order to answer, Respondents filed responses to the amended petition (ECF Nos. 6, 13, 16).  Following a series of extensions, Petitioner filed a reply.  (ECF No. 21).  Also before the Court is Petitioner's motion requesting that he be permitted to withdraw and replace his previously filed reply some four months after it was filed (ECF No. 22), to which Respondents filed a response.  (ECF No. 23).  For the following reasons, the Court will deny Petitioner's amended habeas petition, deny Petitioner a certificate of appealability, and deny Petitioner's motion as moot.

## I.  BACKGROUND

In affirming Petitioner's conviction, the Superior Court of New Jersey – Appellate Division summarized the evidence and arguments presented at trial as follows:

> On July 17, 2004, Darius Davis was shot four times in the back on a street in Newark.  A jury found [Petitioner] guilty of first degree knowing and purposeful murder, [in violation of N.J. Stat. Ann. §] 2C:11-3a(1) and (2) (Count One); third degree unlawful possession

1

of a weapon (a handgun), [in violation of N.J. Stat. Ann. §] 2C:39-5b (Count Two); and second degree possession of a weapon for an unlawful purpose (Count Three), [in violation of N.J. Stat. Ann. §] 2C:39-4a. After merging Count Three with Count One, the judge imposed a fifty-year term of imprisonment subject to a No Early Release Act[] 85% parole ineligibility term. On Count Two, the judge imposed a five-year . . . concurrent term of imprisonment. The judge also imposed the appropriate fees, penalties[,] and assessments.

The facts are relatively straightforward. On the morning of July 17, 2004, Darius Davis, known as Kojak, had his hair cut by Bowman "Bomber" Caldwell at Bombers Unisex Salon on South 8th Street in Newark. Willard Lester was in the shop at the same time, as were several other people, including Idrissa Wilson and two young girls [who were] about eight or nine years old. After Bomber Caldwell cut Kojak's hair, Kojak went into the bathroom. A man described as a light-skinned black man, identified by Caldwell and Lester as [Petitioner], entered the shop looking for Kojak. Informed that he was in the bathroom, [Petitioner] went to find Kojak. Caldwell and Idrissa Wilson heard [Petitioner] tell Kojak they had something to talk about and the two men left the shop, although Wilson was unable to identify [Petitioner] as the man that left the shop with Kojak.

Within minutes, Lester, who was sitting near the door and front window, exclaimed that Kojak had been or was in the course of being shot. Lester described Kojak walking up the street trying to return to Bomber's shop. As he reached the top step, Kojak collapsed.

Bomber Caldwell did not witness the shooting or Kojak's progress up the street. When he heard Lester exclaim that Kojak had been shot, he hurried to put the young girls in a back room away from harm. Then, he tried to call for an ambulance. He encountered the victim as he reached the top step and porch of his shop.

Kojak was pronounced dead at the hospital. The medical examiner, Dr. Wayne Wilson, testified that the victim died of four perforating gunshot wounds: one in and out of his right shoulder; two in and out of his right chest; and one in the lower left side of his back. All entered through the back and exited through the front of his body. The gunshots to the right chest broke the right first, third[,] and fifth ribs, and passed through the right lung. These wounds caused the right lung to collapse and a large amount of blood to accumulate in the right chest cavity. The gunshot to the left lower

2

back perforated the left kidney and renal artery, and the muscle below the seventh rib. It, too, caused a large amount of bleeding into the abdominal cavity. The medical examiner opined that the victim may have been slightly bent over when the bullet in the left lower back entered his body. He was not shot at close range. The muzzle of the gun was no less than eighteen inches to two feet from the victim when the shots were fired. The medical examiner could not determine the farthest distance between the muzzle of the gun and the victim when the shots were fired.

Detectives at the crime scene were able to determine that six shots were fired. Two shots were fired into the victim's truck from the passenger side of [Petitioner]'s vehicle. None of those shots struck the victim. The other four shots struck the victim in the back as he left the area of his truck and tried to flee in the direction of Bomber Caldwell's shop. Ballistic examination of the bullets confirmed that all of the shots were fired from a single gun.

The crime scene observations of the detectives confirmed Lester's July 14 and August 6 statements and his grand jury testimony, except that Lester stated at one time that [Petitioner] fired at Kojak from the driver's side of the truck. In his statements and in his grand jury testimony, Lester also stated that Kojak and [Petitioner] left the shop together and that he saw [Petitioner] fire at least six shots. He also testified that he observed [Petitioner] walk calmly across the street, enter a black sports car, and slowly drive away from the scene. He also provided detectives with a partial license plate number. Neither the car nor the gun were ever located.

At trial, Lester was less forthcoming. He testified that Kojak was in Bomber's shop and that he saw [Petitioner] enter the shop. He testified that he did not hear [Petitioner] state that Kojak and he needed to talk. He related that both left the shop but not together. Lester testified that he did not see the two men meet until they were further down the street and close to the victim's truck. He did identify [Petitioner], however, as the shooter. As a result of the inconsistencies in Lester's testimony, after a . . . hearing, the trial judge permitted several portions of Lester's July and August statements to be introduced in evidence.

. . . .

. . . At the commencement of trial, the judge and defense counsel learned that Lester had been shot in March 2005. His assailant was never identified, much less arrested and prosecuted. At the commencement of the trial, the prosecutor provided defense counsel

3

with information about the investigation of the March 2005 shooting of Lester.  The jury never learned that Lester had been shot in March 2005.

In addition, Lester informed the prosecutor before the trial that someone approached him and offered him money not to testify.  Lester could not identify the person.  This[,] too[,] was disclosed to defense counsel.  The jury never learned about this incident.

Lester never testified that he feared [Petitioner] or was afraid of him.  He was a reluctant witness.  He clearly backtracked from some of the statements he made on the day of and soon after the July 17, 2004[,] shooting.  At one point, the prosecutor asked Lester directly whether he was afraid.  Defense counsel lodged an immediate objection, and an extended hearing out of the presence of the jury occurred.  At the conclusion of the hearing, the prosecutor stated he would withdraw the question and neither party approached the issue of whether Lester was concerned that his testimony placed him in fear for his personal safety.

The prosecutor devoted a considerable portion of his summation to the testimony of Willard Lester.  His summation followed defense counsel's summation which also focused on the testimony of Willard Lester.  In fact, defense counsel argued that "this is a case without a gun, without any DNA, without any fingerprints, without anything other than the testimony of one individual, and that individual is Willard Lester."  Defense counsel proceeded to argue that "Willard Lester . . . is not telling you the truth. . . ."  Defense counsel then proceeded to identify the many differences between Lester's initial statements on July 17 and August 4, 2004, his grand jury testimony in which he first mentioned that the victim was in his truck when the shooting started, and his trial testimony.  He argued that the forensic evidence contradicted Lester's grand jury testimony that [Petitioner] fired two shots through the driver's side of the victim's truck.  He challenged the jury to ask themselves, "How much contradiction can there be?" and "How much lack of credibility can one person have?"

During his summation, the prosecutor used terms suggesting emotional stress, including, "pressure," "courage," "tension," "concern about himself," "torture," "suffer," "safe," and "protect himself nineteen times during his comments on Lester's testimony.  [Petitioner argued on appeal that] these comments were improper and contrary to the evidence, and [that] the trial judge issued inadequate instructions to the jury at the time he addressed an

4

objection or in his final instructions to cure the harm caused by the prosecutor. . .

First, [Petitioner] contests the prosecutor's use of the term "pressure" in describing Lester's testimony. The word was used in discussing Lester's grand jury testimony. The prosecutor stated: "The defendant is not at grand jury. So when he testifies there it's just 23 people such as yourselves, the Prosecutor and the clerk, and there's no pressure of him having to sit in front of the man that he says committed a murder and testify." [(emphasis in original opinion)]. Defense counsel immediately objected stating there was no evidence that [Lester] was under pressure to testify. The trial judge overruled the objection because he did not think it objectionable to highlight the difference between testifying at a proceeding where the defendant is not present and a trial when a witness must confront the accused. He cautioned the prosecutor, however, not to use the word "pressure" in the future.

The prosecutor used the term "pressure" again, but not in reference to Lester's testimony. He simply noted that a trial produces pressure on all involved in the trial that causes some people to make mistakes. Defense counsel did not object to this remark.

The prosecutor then proceeded to review the forensic evidence and the testimony of Lester and Caldwell to establish that much of the evidence was uncontested. After noting that Lester identified [Petitioner] from a photo array and Caldwell identified [Petitioner] from a single photo, the prosecutor noted that police then had a suspect and [Petitioner] surrendered to the police. At this point, the prosecutor stated:

> Why would anyone go to a barbershop in the neighborhood he grew up in, shoot someone in broad daylight from a view he had to have known that he could be seen from that doorway, and shoot the man in broad daylight, and then drive away nonchalantly like nothing happened? Because he does not expect anyone to have the courage to come forward and testify against him as to what they saw. (emphasis added [by the Appellate Division]).

Defense counsel immediately objected. The trial judge rejected defendant's argument that the word "courage" suggested someone had been intimidated but barred the prosecutor from stating or suggesting that [Petitioner] had threatened anyone.

The prosecutor continued with his summation.  He stated:

> So what we have is a broad daylight murder.
> Broad daylight.  No masks, no gloves, no stealth;
> didn't sneak up on him.  Broad daylight.
>
> If you commit a murder in broad daylight in
> front of people you know, <u>I think it's fair to infer that
> what you count on is that no one's going to want to
> testify against you</u>.  (emphasis added [by the
> Appellate Division]).

Defense counsel made the same objection; the judge overruled the objection.

Soon thereafter, the prosecutor commented on the testimony of Idrissa Wilson.  She had testified only that a man came into Bomber's shop looking for the victim and they left together.  She did not identify [Petitioner] as the man looking for the victim.  She also heard Lester speak excitedly.  The prosecutor commented that you could see and hear the tension she felt about being a witness.  He said, "I think you could see it on her face and hear it in her voice, the tension she felt being here."  He continued: "This is not an easy thing to come forward and give any information about a murder that occurred in broad daylight."  Defense counsel did no object to these remarks.

Thereafter, the prosecutor noted that Lester "doesn't even want to admit he knows what the color of the truck was anymore" and proceeded to discuss recanting witnesses.  He said:

> And that goes to the credibility, the weight, what
> weight do you give his testimony?  The statement
> that he gave when he was excited on July 17th about
> what happened, or what he says later on after a year
> and a half of having this weigh on his mind?  He
> doesn't even want to admit he knows what the color
> of the truck was anymore.
>
> Ladies and gentlemen, witnesses recant.
> That's what they do.  They recant.  It's a word you're
> going to hear in the judge's instructions.   Recant
> means you take back what you said before under
> oath.  They do that for many reasons.

> Use your common sense.  Use your common
> knowledge of how people act, and you can figure out
> why someone like Willard Lester would do that.
> (emphasis added [by the Appellate Division]).

Defense counsel did not object to this comment at trial.  Instead, the prosecutor continued to describe the events of July 17, 2004, and noted how the victim had placed his hand on Lester's shoulder before he collapsed and died.  The prosecutor stated:

> That was a powerful moment for Mr. Lester because
> he knows that was the last contact that Darius Davis
> had with us, the living.  It was the last contact, the
> man touched his shoulder.  A year and a half later,
> this is a ghostly touch.  It's faded.  Not as powerful
> as it was then, but it's still there.  That touch didn't
> just touch his shoulder.  That's the touch that went
> straight through Mr. Lester's soul; why he had to tell
> the truth that day of what he saw.  He could not let
> their friend just die alone.  That touch gave him the
> courage to tell the truth about what happened.
> (emphasis added [by the Appellate Division]).

The prosecutor continued: "But time's gone by.  Now the man is sitting right across from him, and he doesn't remember that touch so much.  It's not as fresh in his mind.  It's not like it was that day." (emphasis added [by the Appellate Division]).  Although [Petitioner contended on appeal] that this remark implied Lester had something to fear from [him]; defense counsel did not object to the comment at the time.

However, defense counsel did object shortly thereafter when the prosecutor made the following comment in the context of Caldwell's and Lester's identifications of [Petitioner]:

> Ladies and gentlemen, I would just submit that this
> was a broad daylight murder, 120 feet from
> [Caldwell's] barbershop, and [Caldwell] works
> there.  That's his shop every day.  He's not going
> anywhere. He said what he could say.  [Petitioner]'s
> the man that came in and asked for [the victim].
> Bowman Caldwell is telling you, in the way he can,
> that he is the man that came in and asked for [the
> victim].  There's no doubt he knew him.  He is the
> man.  That's the man.  He was there.  Willard Lester
> watched it happen because he was in that seat that he

> sits in where he chills, hangs out in the barbershop. He helps. He sweeps up sometimes. That's his hangout. He's comfortable there. But something excited him very terribly, and <u>he threw caution to the wind. He wasn't concerned about himself when he gave this statement</u>. He was concerned about telling the police what he saw. (emphasis added [by the Appellate Division]).

Defense counsel immediately objected to this comment, but the trial judge overruled the objection. The prosecutor then added: "And that takes courage." Defense counsel did not object to this added comment.

Thereafter, the prosecutor highlighted portions of Lester's grand jury testimony. The prosecutor discussed the fact Lester told the grand jury certain details about the victim's truck and provided an illustration of Lester's recantation of his grand jury testimony. The prosecutor proceeded to review the sequence of events on the day of the murder, the defense expert's opinions, the ballistics evidence, and Lester's testimony. He likened the evidence as different pieces of a puzzle, that when put together, form a complete picture. The prosecutor then noted:

> Because if the picture doesn't make sense, then something's wrong with the picture.
>
> Now where doesn't this picture make sense? The picture doesn't make sense that Willard Lester would come up on the stand and say I didn't even know [the victim] had a blue Jeep. I thought he had a white Jeep. That doesn't make sense. <u>Something's going on</u>. (emphasis added [by the Appellate Division]).

Despite [Petitioner] now insisting this comment furthered the prosecutor's "fear" theme during summation, defense counsel did not object at the time.

The prosecutor continued:

> There's some other mechanism. And it's not that Willard Lester is a liar. Yeah, that's a lie. Because if he knew it was blue, it was a lie. But this is a trial, and a trial gets to the truth. And you have tools to get you the truth, and the Judge gives those tools to

you in the form of the law because the law tells you how to take that testimony that doesn't even recognize that [the victim] has the blue Jeep, compare it to all the things he said before, and how to weigh that evidence. That's what I mean when I say witnesses recant. They do. But the law knows that, and the law will give you the tools to examine that, and weigh it, and figure out what happened.

Willard Lester, ladies and gentlemen, is not a bad man. He is not a bad man. He is not a liar. He's just an ordinary guy that likes to hang out at Bomber's and not bother no one, and he was thrust into these circumstances. And he couldn't help himself because at that moment he wasn't thinking about himself, he was thinking about [the victim]. Now he's thinking about Willard Lester, and you see it on his face. (emphasis added [by the Appellate Division]).

Defense counsel objected again. The trial judge noted the objection and permitted the prosecutor to continue:

When Willard Lester testified . . . you had the ability, you had the front row seats, you saw his face. You saw the torture that was written on that face. That man was suffering, and his suffering was no more evident than at the point when he started making up a story about, well, I didn't see it; someone told me. It was torture because the man is here now. It's the trial, and he has to point his finger at the man sitting right there in the black shirt and say that's the guy I saw kill [the victim] in broad daylight in front of Bomber's Barbershop, the place where I like to hang out every day. He suffered through that testimony. It was torture. (emphasis added [by the Appellate Division]).

Defendant characterizes this segment of the summation as the prosecutor "reemphasizing the 'fear' argument in more dramatic terms,", yet defense counsel did not object to the latter portion of this statement at trial.

The prosecutor then discussed defense counsel's "tough" cross-examination of Lester and how Lester never wavered from his position that [Petitioner] shot the victim. The prosecutor added:

> Another interesting thing, no matter how badly, how badly [defense counsel] is able to get Mr. Willard Lester <u>to recant, to retreat</u>, to say I didn't see that, someone told me that' no matter how badly, when you put his statements in front of him, and even the grand jury, he always came back and said, well, that was true.  <u>He's torn.  He obviously, does not want to be the one sitting in front of [Petitioner] and saying you're the guy that did it</u> . . . . (emphasis added [by the Appellate Division])

Again, defense counsel objected, and [the trial judge] noted the objection, but allowed the prosecutor to proceed.

> Later, the prosecutor commented on Lester's in-court identification of [Petitioner].  He stated:

> No matter what, that was one thing [Lester] could not say, he could not bring himself to deny that the man he saw shooting [the victim] was right there.  That, he couldn't back away from.  He struggled, <u>and he probably wanted to</u>, but that he couldn't do. (emphasis added [by the Appellate Division]).

On appeal, [Petitioner argued that] this remark demonstrates the prosecutor's argument "that when Lester identified the [Petitioner] as the shooter he was nevertheless wracked by fear."  Defense counsel did not object to this comment at trial.  Further, the prosecutor immediately followed this remark by stating, "This is when I say, you know, being on trial is hard.  It is hard."

> However, defense counsel did object to the following comment, which the prosecutor made soon thereafter:

> See now we get into the areas where Willard Lester can recant, where he can retreat and do it safely because he's not betraying his core belief as to who killed Darius Davis.  And he, [defense counsel], characterized it as he was toying with him, and in a way he was because now he's splitting hairs.  I didn't see them walk out together.  One was already out and one was behind.  But does that mean they're not walking out together?  <u>Maybe in his mind he's telegraphing, and I think he's telegraphing to [Petitioner].  That's my belief, that he wants him to know I'm not the one, I'm not ratting you out here.</u>

10

. . . .

> I'm trying to – that's what I think is going on in his mind. (emphasis added [by the Appellate Division]).

The trial judge sustained the objection and addressed the prosecutor:

> I think you've crossed the line at this point. You're now attributing to the mental process of a particular witness, Mr. Lester, as opposed to saying to the jury, as I permitted, is it logical. You can draw the inference that someone may be nervous, or somebody might be fearful. Now you're saying, as I understand the comments, that Mr. Lester was telegraphing to him. Mr. Lester was saying I'm not ratting you out. So I'll sustain the objection.

The judge also issued the following curative instruction:

> Ladies and gentlemen, the argument or comments being advanced by the Prosecutor as to what the state of mind of Mr. Lester was when he was testifying, or what he has referred to, was trying to communicate, that is improper comment. It's not based in the evidence, and that part of the summation about what Mr. Lester may have been trying to communicate to [Petitioner] is not something you should consider in your deliberations. All right? That part of the summation that just preceded my remarks and just preceded the sidebar was inappropriate.

The prosecutor continued his summation by making several remarks that Lester "retreated" in his testimony while on the witness stand. The prosecutor surmised

> We know he's retreating. We know he's recanting. But he's saying I must have felt I was telling the truth when I said it. He's in a different position now. He's not at the police station surrounded by police officers where he's safe. He's not in grand jury. (emphasis added [by the Appellate Division]).

Immediately, defense counsel objected to this remark. The trial judge responded with the following instruction: "Any reference to whether a person would be safe while they're in the police station as

opposed to safe in the courtroom is inappropriate comment.  I'm asking you, ladies and gentlemen, to please disregard that comment."  Nevertheless, the prosecutor continued:

> [Lester] was at the police station when he gave these statements, ladies and gentlemen.  You can decide for yourselves the trustworthiness of those statements and what was going on his mind when he gave those statements as opposed to when he has to testify on a witness stand at trial.  (emphasis added [by the Appellate Division]).

Defense counsel did not object at trial to the scope or adequacy of the judge's instruction or to the prosecutor's comments after the curative instruction.

> The prosecutor continued to emphasize Lester's "retreat" during his trial testimony:

> I think you can infer from the testimony, and later on I'll show you where you can infer from Willard Lester's own testimony at this point he's really trying to cover up.  He's trying to retreat.  He's trying to back away from what he said he saw.  It was the whole scene, if you recall when [defense counsel] said who told you, and he must have said 50 times, who told me, who told me.  He couldn't – he didn't just come out and say it.  It had to be pulled out of him.  And in the end, if you recall the testimony, he couldn't even say . . . his name.  He said B. told me.  He couldn't even say Bomber's name.  He said B. He must have said B four times.  And [defense counsel] had to ask him who are you talking about, and he finally said Bomber.  The man was torn up.  The man was torn up, and he tried to cover.  He tried to duck.  He tried to recant.  He tried to protect himself.  But in the end he never backed off.  He never backed off of who he said did it.  (emphasis added [by the Appellate Division]).

Defense counsel objected to this final remark, but the judge permitted the prosecutor to proceed.

> The prosecutor concluded his summation, and the trial judge conducted a charge conference with counsel.  Defense counsel initially advocated for an abbreviated charge on a recanting witness,

so as to avoid any suggestion fear played a role in the consistency of Lester's statements, but then clarified that a prior contradictory charge only would be sufficient. The prosecutor characterized Lester's testimony as "clearly a recantation," and the judge agreed. The judge then determined an abbreviated charge on witness recantation would be appropriate.

> Thereafter, the trial judge proposed the following charge:

> Counsel have, during summations, suggested reasons for witnesses testifying as they did at this trial. Counsel's inferred or suggested reasons are mere argument and not evidence. It is within your – meaning the jury obviously – sole province as judges of the facts to assess the credibility or believability of a witness's trial testimony.

Defense counsel found this proposed charge unacceptable. He argued that despite previous rulings that evidence of Lester's fear would not be considered at trial, the prosecutor nevertheless argued during summation that Lester "was under pressure[,] that it took courage to testify[,] . . . that there were recantations[,] . . . that [he] was suffering, . . . was being tortured . . . or that he felt tortured in testifying[,] . . . [and] was trying to protect himself in response[]." Thus, defense counsel moved for a mistrial, or in the alternative, requested the judge consider [a more lengthy instruction directing the jury not to consider Lester's "fear" or "intimidation" in any way in assessing his credibility]. The trial judge denied the motion for a mistrial, and explained that his proposed charge was fair and appropriate. "To go further and to get into the substance, if you will, of the issues [concerning Lester's fear] may highlight them and actually have an adverse effect." Therefore, when the judge charged the jury, he simply provided the previously-stated proposed abbreviated charge to address the concerns of counsel during the summation.

> Among other things, the judge also charged the jury with respect to Lester's prior statements to the police and the grand jury and in accordance with [the New Jersey model jury charge on the prior contradictory statements of witnesses]. In deciding whether Lester's prior statements reflected the truth, the judge instructed the jury to "consider the extent of the inconsistency or omission and the importance or lack of importance of the inconsistency or omission on the overall testimony of the witness as bearing on his credibility." Additionally, the judge noted: "You may consider such factors as to where and when the prior statement or omission occurred, and the

reasons, if any, if given."  Once again in accordance with the model charge, the judge added:

> The extent to which such inconsistencies or omissions reflect the truth is for you to determine. Consider their materiality and relationship to his entire testimony and all of the evidence in this case; when, where, and the circumstances under which they were said or omitted, and whether the reasons he gave you therefor appear to be believable and logical.  (emphasis added [by the Appellate Division]).

> Defense counsel indicated during the charge conference that a charge on Lester's prior contradictory statements would be appropriate, and never suggested the judge stray from the model charge.

(Document 8 attached to ECF No. 6 at 2-5, 7-24).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012).  Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts.  *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## B. Analysis

### 1. Petitioner's prosecutorial misconduct claims

In his first series of claims, Petitioner contends that various statements made by the prosecutor during his summation were improper and denied him his right to Due Process as a result. Petitioner specifically takes issue with two portions of the state's summation – the portion dealing with the prosecutor's summation of the facts of the murder and explanation for Willard Lester's contradictory statements which is reproduced in substantial part above, which Petitioner

contends was both generally improper and constituted improper vouching for Lester's credibility, and a second portion of the summation in which the prosecutor called into question the testimony of the defense's ballistics expert, which Petitioner asserts amounts to an improper disparaging of his defense. On direct appeal, the Appellate Division rejected all of these arguments, finding that

> Read in its entirety, we conclude that the prosecutor did not interject in this record that Lester or any other witness had been or was threatened by [Petitioner]. As noted, the jury never learned that Lester had been shot multiple times in March 2005. The jury never learned that some unknown person sought to dissuade Lester from testifying. The jury did see and hear a witness who reluctantly implicated [Petitioner] in the murder of an acquaintance. The prosecutor was simply stating the obvious, that Lester retreated from his earlier statements and grand jury testimony, and that it is difficult for some people to accuse a person of any wrongdoing, much less of murder, to their face. The prosecutor also emphasized the obvious when he commented that some witnesses wilt under cross-examination.
>
> We review a cold record, but Lester's discomfort on the witness stand was palpable. It is in this context that the prosecutor used the words "tension," "struggle," and "torture." None of the comments singly or in combination conveyed to the jury that Lester feared [Petitioner] would harm him. We, therefore, conclude that none of the cited remarks in the prosecutor's summation, singly or in combination, deprived [Petitioner] of a fair trial.
>
> We are also not persuaded that the prosecutor ridiculed or disparaged [Petitioner]'s ballistic expert, John Cayton. To be sure, a prosecutor cannot "'cast[] unjustified aspersions on the defense or defense counsel,'" *State v. Jenewicz*, 193 N.J. 440, 471 (2008) (quoting *State v. Nelson*, 173 N.J. 417, 461 (2002)); however none of the prosecutor's criticisms of [Petitioner]'s expert rise to the level of requiring a new trial.
>
> The prosecutor argued that Cayton was being "cute," and the prosecutor suggested that Cayton didn't interview the medical examiner because "[m]aybe he really didn't want to know." These remarks suggest that [Petitioner]'s expert was trying to construct a defense without reference to the facts. Such comments identify weaknesses in a position and are legitimate comments. []They do not suggest that the expert is a partisan or a person who will say

anything for money as in *Nelson*[,] 173 N.J. at 462, where the defense expert was labeled a partisan with an agenda.

We also reject the argument that the prosecutor vouched for Lester's credibility and offered personal remarks as to his theory of the murder.  Viewing the summation in its entirety the prosecutor did nothing more than argue how the jury could find Lester's testimony credible and marshaled and reconciled disparate elements of the evidence to support the State's contention that [Petitioner] shot the victim four times in the back.  This is the essence of advocacy.  He did not vouch for the credibility of any witness or offer a personal opinion of [Petitioner]'s guilt.

(Document 8 attached to ECF No. 6 at 28-30).

The duty of a prosecutor in a criminal trial is not to secure convictions, but to see that justice is done, and prosecutors must therefore "refrain from [the use of] improper methods calculated to produce a wrongful conviction."  *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016).  While a prosecutor "may strike hard blows [during his summation], he is not at liberty to strike foul ones."  *Berger*, 295 U.S. at 88; *Bailey*, 840 F.3d at 124.  A criminal conviction, however, "is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."  *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985).  Improper comments by a prosecutor during summation will therefore only warrant habeas relief where those comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Copenhefer v. Horn*, 696 F.3d 377, 392 n. 5 (3d Cir. 2012).

A prosecutor's comments can cross the lines of propriety where the prosecutor improperly vouches for the credibility of a witness.  This occurs where a prosecutor assures the jury of the witness's credibility not based on the evidence produced at trial, but on the basis of either the

prosecutor's personal knowledge or some other extrinsic information available to the prosecutor but not presented to the jury. *See United States v. Walker*, 155 F.3d 180, 184, 187 (3d Cir. 1998); *see also United States v. Lore*, 430 F.3d 190, 211-12 (3d Cir. 2005). As the Third Circuit explained in *Walker*,

> Our case law indicates that to find vouching two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge or other information not contained in the record. Thus, it is not enough for a defendant . . . to assert that the prosecutor assured the jury that a witness' testimony was credible. The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record. It follows that where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching. Likewise, prosecutorial comment that points to a lack of evidence in the record which supports a defendant's argument that the witness is not credible is proper so long as the comment does not constitute an assurance by the prosecutor that the witness is credible.

*Walker*, 155 F.3d at 184.

Having reviewed the summation in full and in context, it is clear that the prosecutor's comments did not deny Petitioner a fair trial. As noted by the Appellate Division, the prosecutor's summation was a direct response to Petitioner's counsel's attack's on Lester's credibility, and sought neither to disparage Petitioner's defense nor to assert that Petitioner had in some way threatened or intimidated Lester. Instead, the prosecutor attempted to bring together the various facts evinced at trial and use those facts as well as the differences in time and setting for Lester's various statements and testimony to provide the jury with a cogent basis for both finding Lester's identification of Petitioner as the shooter credible while acknowledging the changes in Lester's versions of events. The summation thus sought to use the facts at hand, and not some private

18

knowledge or other improper basis, to argue that Lester's testimony should be credited.  The prosecution's summation thus neither amounted to vouching, nor suggested the jury should find Petitioner guilty based on any basis but the facts presented at trial.  Likewise, although the prosecutor did suggest that Petitioner's expert sought to present a less than complete picture of the facts to support Petitioner's defense, the prosecutor did not run afoul of Due Process in critiquing that expert during his summation.  Viewed in full and in context, the prosecution's summation did not deny Petitioner a fundamentally fair trial, and Petitioner's first set of claims therefore fail to set forth a valid basis for habeas relief.

**2.  Petitioner's lost evidence claim**

Petitioner next asserts that he was denied a fair trial when the victim's clothing was accidentally lost following its examination by the medical examiner, preventing his ballistics expert from examining the clothing for gun shot residue or other such evidence.  Petitioner argues that this loss of evidence prevented him from challenging the testimony of Lester that, at times, the shooter was between two and four feet from the victim when he fired some of the shots.  The Appellate Division rejected this claim for lack of prejudice, finding that the clothing was, at best, needed only to counter an early theory of the facts in which the State had suggested that the victim was shot at "close" range, a theory which was not pursued at trial.  (Document 8 attached to ECF No. 6 at 30).  The testimony at trial, including that of the medical examiner, however, clearly indicated that the victim was not shot at a range of less than eighteen to twenty-four inches, and that the victim may well have been shot from much further away as the medical examiner had found no traces of gun shot residue on the victim's clothing.  Petitioner thus cannot show that he was prejudiced by the loss of the victim's clothing as the evidence the clothing could have provided

19

– that the victim was not shot from close enough range to leave a deposit of residue – was already provided at trial by the medical examiner, leaving defense counsel free to argue that the evidence contradicted Lester's version of events.   The loss of the clothing therefore did not have a "substantial and injurious effect or influence in determining the jury's verdict," and was thus harmless.  *Fry v. Piller*, 551 U.S. 112, 116 (2007); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).  The loss of the clothing therefore serves as no basis for habeas relief.

### 3.  Petitioner's identification claim

Petitioner next asserts that the trial court and Appellate Division erred in refusing to either overturn Petitioner's conviction or exclude Caldwell's in and out of court identification of Petitioner as the man who came looking for the victim at the barbershop as he believes those identifications were impermissibly suggestive and unreliable as a result.  The Appellate Division rejected this argument, finding that, notwithstanding the inherently suggestive nature of showing Caldwell a single picture to produce an identification of Petitioner, Caldwell's identification was "inherently reliable" and thus admissible as Caldwell "had known [Petitioner] since [he] was in middle school" and Petitioner "had been in his shop three or four times over the [previous] two years."  (Document 8 attached to ECF No. 6 at 31).  The Supreme Court set the standard for determining the admissibility of an out of court identification in *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).  In *Manson*, the Supreme Court held that an identification will violate due process and suppression will potentially be warranted where the procedure used by the police to produce the identification was "unnecessarily suggestive and . . . create[d] a substantial risk of misidentification."  *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006); *see also United States v. Anthony*, 458 F. App'x 215, 218 (3d Cir. 2012).  Suggestive procedures alone, however,

will not warrant suppression of an out of court identification, as "reliability is the linchpin in determining the admissibility of identification testimony . . . The factors to be considered [in determining whether an identification is reliable enough to be admitted] include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Anthony*, 458 F. App'x at 218 (quoting *Manson*, 432 U.S. at 114). Where these factors indicate that the identification is reliable despite the suggestive procedure, the admission of the identification does not run afoul of the Due Process Clause. *Id.* Here, the factors clearly show that Caldwell's identification was inherently reliable – he knew Petitioner for years, and testified that Petitioner came into his shop and immediate vicinity during daylight hours to look for the victim shortly before the shooting. Thus, even accepting, as did the Appellate Division, that the showing of a single photo to Caldwell was inherently reliable, Caldwell's identification of Petitioner had sufficient indicia of reliability that it, and the in court identification that followed, did not violate Due Process. Petitioner's identification claim therefore fails to set forth a valid basis for habeas relief.

**4. Petitioner's voir dire claim**

Petitioner next argues that the trial court committed reversible error when it failed to fully voir dire one of the jurors prior to trial on his relationship to a law enforcement officer. Specifically, the juror stated that he had "relatives or close friends in law enforcement," but assured the court that nothing about that relationship would impact his ability to be fair as a juror. (Document 27 attached to ECF No. 6 at 47). Petitioner's counsel thereafter asked the judge at

sidebar to be permitted to ask the juror about the relative or friend in law enforcement, at which point the judge stated he would permit such questioning but would need to leave shortly and end jury selection for the day.  (*Id.*).  Neither the court nor defense counsel, however, returned to the issue when jury selection resumed, and defense counsel did not use any of his numerous remaining challenges to excuse the juror in question.  Petitioner contends that the judge's failure to return to the issue when selection resumed denied him a fair trial as the juror *may* have had some unexplored bias notwithstanding the juror's assurance that the relationship would not affect his ability to be fair.  The Appellate Division rejected this argument as completely meritless.  (Document 8 attached to ECF No. 6 at 31).  Moreover, Petitioner has utterly failed to identify any applicable federal law requiring a state court judge to look into potential bias based solely on a relationship to a police officer after a juror states that he could be fair, even though defense counsel failed to revisit the issue after a recess when numerous challenges remained and never sought to excuse or dismiss that juror.  As this Court is aware of no such federal law, let alone any clearly established Supreme Court decisions on point, Petitioner has failed to show that the state court's rejection of his speculative voir dire claim was contrary to clearly established federal law.  This claim therefore fails to set forth a valid basis for habeas relief.  *Woods*, 125 S. Ct. at 1376.

**5. Petitioner's jury instruction claim**

Petitioner also argues that the trial court's jury instructions were unconstitutionally deficient.  In so arguing, Petitioner essentially repackages his claims regarding the prosecutor's summation and Caldwell's identifications as issues requiring significant additional instructions.  That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72

(1991)), *cert. denied*, 534 U.S. 919 (2001).  Habeas relief is therefore available based on an allegation that a petitioner's jury instructions were improper only when "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  A court reviewing such a claim must consider the challenged jury instruction in the context of the entire charge and the trial as a whole. *Duncan*, 256 F.3d at 203.  That the challenged instruction was "undesirable, erroneous, or even universally condemned," is insufficient to warrant habeas relief, a petitioner can only prevail on such a claim by showing that the instruction rendered her trial fundamentally unfair. *Id.*  It is clear that jury instructions at Petitioner's trial did not render his trial fundamentally unfair.  The trial judge, as discussed by the Appellate Division and quoted above, provided an adequate curative instruction on the few occasions where the prosecution crossed the line during its summation, and the prosecution's summation in any event even in the absence of a curative instruction did not deny Petitioner a fair trial as explained above.  The trial judge more than adequately addressed the issue of Lester's recanted testimony, the prosecutor's comments on the defense expert were neither improper nor so dire as to require a curative instruction, and the inherent reliability of Caldwell's identification of Petitioner undercut any need for additional instructions as to his identification. As the jury instruction in this matter clearly did not render Petitioner's trial fundamentally unfair, Petitioner's instruction claim fails to set forth a valid basis for habeas relief.

**6. Petitioner's ineffective assistance of counsel claims**

In his final claim, Petitioner contends that his trial counsel proved constitutionally ineffective in allegedly failing to advise him of his sentencing exposure before Petitioner rejected a plea offer bearing a recommended sentence significantly shorter than the mandatory minimum

that would result from a guilty verdict at trial.  Petitioner first raised this claim during his first PCR proceeding, and Petitioner received an evidentiary hearing related to this issue.  Both the PCR court and Appellate Division rejected Petitioner's claim, however, with the Appellate Division explaining that they were

> satisfied the [PCR] court correctly rejected [Petitioner]'s claim that his attorney was ineffective by failing to advise him of his minimum sentencing exposure if convicted at trial.  The record supports the court's factual determination that trial counsel discussed [Petitioner]'s minimum sentencing exposure during their discussion of the State's pre-trial plea offer, and there was no evidence presented to the contrary.
>
> Trial counsel testified he had a discussion with [Petitioner] about a plea offer from the State that included a sentencing recommendation of less than ten years.  Counsel and [Petitioner] discussed the plea offer and whether [Petitioner] wanted to accept the offer or proceed to trial.  Although counsel did not have a specific recollection [of] discussing the minimum sentence with [Petitioner], counsel testified the minimum sentence "came up at the time that [the State] made the [plea] offer," he could not "conceive of" not telling [Petitioner] about his minimum sentencing exposure, and he "would have done it at some point."
>
> Accordingly, the record supports the PCR court's conclusion that trial counsel advised [Petitioner] of his minimum sentencing exposure if convicted at trial.  The court credited trial counsel's testimony that he would have told [Petitioner] about the offer and the thirty-year minimum exposure with a trial, and compared the two options because "it was his practice to do so," and we defer to the court's fact-finding[.]  Thus, [Petitioner] did not satisfy his burden of proving [counsel's deficiency by a preponderance of the evidence].
>
> Moreover, defendant failed to present any evidence showing that if he had been advised of his minimum sentencing exposure, there is a reasonable probability he would have accepted the State's plea offer [in light of Petitioner's trial counsel's certification that both "were of the mutual opinion that the State's case was very weak" and that Petitioner was likely to succeed at trial].

(Document 19 attached to ECF No. 6 at 12-13; Document 7 attached to ECF No. 13 at 11-12). Petitioner thereafter sought to raise this claim once again in his third PCR, which was the subject of the stay of this matter, after his trial counsel provided him with a belated certification including the assertion that there was "a distinct possibility that [counsel] did not advise [Petitioner] that if the trial resulted in a conviction, he would be facing [thirty] years to life in prison." (Document 7 attached to ECF No. 13 at 5-6). The Appellate Division once again rejected this claim, finding that Petitioner's third PCR was both procedurally barred, and was in any event without any merit as counsel's "new" assertion that there was a possibility that he did not advise Petitioner was not actually contrary to his prior testimony, and as counsel's testimony and certification taken in total more than supported the PCR court's finding both that Petitioner *had* been advised of his exposure pursuant to counsel's standard practice and that Petitioner in any event had not shown that he would have pled guilty even knowing of his exposure. (*Id.* at 5-12).

Criminal defendants have a "Sixth Amendment right to counsel, [which] extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). To show that counsel's ineffectiveness robbed them of that right and warrants reversal of their conviction, such a defendant must first show that counsel's representation "fell below an objective standard of reasonablenss." *Id.* at 163. In addressing a guilty plea, counsel is required to provide a defendant with sufficient information that he can "make a reasonably informed decision whether to accept a plea offer," which will generally require counsel to discuss with a petitioner the facts of his case, his likelihood of conviction, and his comparative sentencing exposure at trial and through a plea. *United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015) (quoting *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013); *see also Lafler*, 566 U.S. at 163; *Hill v. Lockart*, 474 U.S. 52, 57-58 (1985). Even if a petitioner can make such a showing, however, he must still show that he was prejudiced

25

by counsel's failing by providing facts which indicate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [which i]n the context of pleas [requires] a [petitioner] show the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163.  A petitioner thus must show that he would have accepted the proposed plea agreement absent counsel's deficient advice, that the deal in question would not have been withdrawn, and that the sentence received pursuant to the offered plea would have been less severe than the result of his trial.  *Id.* at 163-64.

Here, the state courts concluded that Petitioner failed to show that counsel did not advise him of his criminal exposure, and that conclusion is strongly supported by the testimony at Petitioner's PCR hearing and is not actually contradicted by counsel's latter day certification. Likewise, the evidence presented to the state courts strongly suggests that Petitioner was in any event not interested in pleading guilty in light of the weakness of the State's case.  The Appellate Division's conclusion that Petitioner therefore also failed to show that he was prejudiced is also supported by the evidence.  The rejection of Petitioner's claim was thus neither contrary to or an unreasonable application of federal law, nor was it contrary to the presented facts.  Petitioner has thus failed to show an entitlement to habeas relief based on counsel's ineffectiveness.  All of Petitioner's claims are therefore clearly without merit, and Petitioner's amended habeas petition must be denied.

Finally, the Court notes that, in July 2020 and some four months after Petitioner filed his reply following several extensions, Petitioner filed a motion seeking leave to withdraw his reply, have the State provide him with new copies of the record of this matter, and refile a new reply brief containing accurate citations to the state court record.  Petitioner also requests in this motion an evidentiary hearing.  Because Petitioner's claims are all clearly without merit and no evidentiary

hearing is therefore warranted in this matter for the reasons expressed above, because Petitioner's amended habeas petition shall be denied, because Petitioner has not suggested that he wishes to provide any further information regarding record citations, because Petitioner has provided no legal basis for permitting him to file a new reply months after he filed his initial reply, and because a reply is in any event not a required document in a habeas matter, this motion is denied as both meritless and moot in light of the denial of the amended petition.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner's claims are without merit for the reasons discussed above, Petitioner has failed to make a substantial showing of the denial of a constitutional right and he is denied a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's amended habeas petition (Document 5 attached to ECF No. 14) is DENIED, Petitioner is DENIED a certificate of appealability, and Petitioner's motion seeking leave to withdraw and replace his reply brief is DENIED as moot in light of the denial of his amended petition.  An appropriate order follows.

Dated: August 3, 2020                                    _s/Susan D. Wigenton_
                                                                   Hon. Susan D. Wigenton,
                                                                   United States District Judge